# EXHIBIT A

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

---

In the Matter of an Arbitration between

Cascades Containerboard Packaging – Lancaster Division (Company, Employer)

And

OPINION
and
DECISION

Graphic Communications Conference of International Brotherhood of Teamsters, Local No. 503 (Union, Employees)

Grievant:  Joseph Nemerowicz (Discharge)

Eric W. Lawson – Impartial Arbitrator

APPEARANCES:

| For the Company by, | Henry S. Kramer, Esq. |
|---|---|
| Witnesses, | Clinton Dockree, Plant Manager |
| | Christopher Debinski. Production Manager |
| | Patricia Hensley, President, COO, Peter M. Vito Associates |
| | Lisa Vito, Vice president, Investigator. Peter M. Vito Associates |
| | Richard Urbanski, Investigative supervisor, Peter M. Vito Associates |
| | Richard Rooney, Investigator, Peter M. Vito Associates |
| For the Union, by | Daniel E. Kornfield, Esq. |
| Witnesses; | Joseph Nemerowicz, Grievant |
| | Clinton Dockree, Plant Manager |

PROCEDURE:

The parties, bound by a collectively negotiated agreement (cna), Joint Exhibit [JE] 1, which provides at Article 5 (Grievance Procedure), Step 5 (Arbitration), for the arbitration of grievances appealed thereto, caused the FMCS to appoint Eric W. Lawson to arbitrate the grievance captioned above and further described below.

In a letter dated July 19, 2019 the Arbitrator was advised of his selection from an FMCS panel to arbitrate a grievance regarding a classification issue, FMCS number 190710-08887. There followed an exchange of e mails between the parties regarding discovery issues. On August 12, 2019 a proposal was made by the parties that the classification

1

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

grievance be superseded with the grievance pending here a matter for which the parties had previously sought the appointment of an arbitrator from FMCS (Number 190604-07739). On August 19th the parties agreed that the matter captioned above would be heard on the date originally agreed to for the hearing in the classification grievance, September 10, 2019 and that grievance would be heard in arbitration at a later date. The parties agreed to apprise FMCS of the change. On August 20, 2019 a conference telephone call between the parties and the Arbitrator took place where arrangements to switch the dates of the hearing for the grievance pending here with the classification grievance was confirmed.

There then followed an exchange of e mails between the parties regarding evidentiary matters which, with regards to the Arbitrator's involvement, ended with his declaration on August 23, 2019 that matters of substance would only be addressed on the record. There did continue however, a steady stream of messages regarding witness scheduling and the manner of taking testimony.

A hearing was held in Cheektowaga New York on September 10, 2019 at which time the parties, including the Grievant, were present and each was offered an opportunity to offer evidence, including testimony from witnesses all of whom were sworn and to otherwise make argument with regard to their respective contentions. At the conclusion of the hearing, at which time both parties rested, they agreed to brief the case. The briefs having been timely received on October 28, 2019, the record was then closed.

On October 2, 2019 the Arbitrator was advised that the Union was withdrawing the classification grievance, 190604-07739.

A letter to the Arbitrator dated October 7, 2019 advised that the NLRB Director, Region 03, had made a determination to defer an NLRB charge (Case Number 03-CA-246320) to arbitration stating that agreement to do so had been mutually agreed to by both parties. There followed on October 16, 2019 a letter from the jackson/lewis (sic) law firm, by Ian Bogaty, Esq. indicating they represented the Company in the NLRB matter and that the Company had not agreed to defer the matter to arbitration. Also, on October 16th a communication from the Union was received requesting that the deferral matter be held in abeyance until briefs had been received.

In a letter to the parties dated October 16, 2019 the Arbitrator acknowledged that at the time of the September 10, 2019 hearing the matter pending before the NLRB had not been deferred but that a thorough hearing regarding the Grievant's discharge had taken place on September 10th. The letter concluded that given the thoroughness of the factual portion of the hearing on September 10th, the parties could chose in their closing briefs due on October 28th to make argument regarding the matter subject to the deferral.

A letter dated October 17, 2019 from the NLRB Region 3 Regional Director stated that the Company had not agreed to authorize the arbitrator, "to decide the statutory issue in this case." However, the deferral of the matter by the Director continued.

## Federal Mediation and Conciliation Service (FMCS)
### 190815 - 10067

A letter dated October 23, 2019 from the Union advised that an unfair labor practice charge filed against the Company on August 26, 2019 for its failure to disclose materials related to this grievance arbitration (Number 03-CA-24277) was withdrawn upon the production of those materials. The Union requested however, that the e mail messages associated with the production of the documents be made a part of the record of the arbitration hearing and specifically referenced page 222 of the transcript of the arbitration hearing. In an e mail dated October 26, 2019 the Company stated that the withdrawal of the ULP charge by the Union should have settled the matter rather than the Union using the withdrawal as a reason to place the matter before the Arbitrator.

**STIPULATIONS (**Transcript Page [TP] 39-40)
JE 1, cna, Effective October 2, 2016 – October 1st, 2020
JE 2, Letter of termination, August 8, 2019
JE 3, Grievance Form, 8/9/2019

1. No procedural issues affecting the Arbitrator's capacity to hear the matter on the merits were presented. (TP 8-10)
2. The Company stipulated that Grievant Nemerowicz appeared at a proceeding before the NLRB as a witness and the Company did not prevail in the matter being litigated (TP 175-177)
3. The Company stipulated that the Grievant signed an affidavit in a civil action brought against it by the Union which was contrary to the interest of the Company and in which the Company did not prevail.[1] (TP 178-180)

**Statement of Issue:**

The Grievance pending here, JE 3, regards the termination of Joseph Nemerowicz, JE 2 and alleges a violation of Article 6 *of the cna, JE 1.

---

*Article 6 Discipline

Section 6.01 The Employer shall have the right to invoke disciplinary action, including discharge or suspension, upon any employee covered by this agreement. The Employer shall notify, in writing, the employee involved and the Union Steward of such action.

Section 6.02 A grievance contesting a disciplinary action must be filed with the Employer within five (5) calendar days from the effective date of such disciplinary action; otherwise, the grievance shall be deemed waived.

Section 6.03 Employees in the unit covered by this Agreement shall be entitled, upon request, to the presence of a Union Representative at any meeting with the Employer in which disciplinary action is imposed upon such employee.

---

[1] UE 4 was marked but not received (TP 180)

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

**BACKGROUND:**

**Employer's evidence:**

Plant Manager, Clinton Dockree, said that the plant manufactures corrugated containers and employs a unionized production and maintenance unit of approximately 82 employees. The work of absent employees is covered with overtime and, where required, with mandatory overtime. (TP 46-48). The plant normally operates Monday through Friday.  Nemorowicz's shift is 2 to 10PM. (TP 100).

The plant was purchased in 2004 from AIM Corrugated which had a cna in effect until 2008 (Company Exhibit [CE] 4)[2]. CE 2 is a cna dated October 2, 2008 – October 1, 2013 between Norampac Industries Inc. and Pressman – Assistants & Office Workers L. No 27 GCIU. CE 1 is a cna dated October 2, 2013 – October 1, 2016 between the same parties as CE 2 (TP 47-53)

At the time of his discharge on August 8, 2019 (JE 2), Grievant Nemerowicz's pay rate was $17.08 (CE 6, TP 59). Dockree described the rate as "over scale," that the contract rate is $14.08 (TP 114).  Nemerowicz works as a baler

During the last three years the Grievant was the ninth non-probationary person to be involuntarily terminated and the first whose termination was arbitrated (TP 59-61, CE 7). Dockree said that none of the previous terminations arose from a medical issue. He said that he was unaware of any basis upon which the Union could have arbitrated the prior terminations (TP 117-119)

Other than this matter, Dockree testified that since 2004 there have been two other grievances that have been arbitrated, one regarding seniority integration and the other regarded a pay scale dispute. (TP 62).

Dockree said that CE 8 is the Company's Code of Ethics Statement.  CE 9 is Grievant Nemerowicz's receipt for a similar document he received the year prior to CE 8 (TP 67-69). Referring to page 5 of CE 8, a statement regarding ethical conduct, Dockree testified that the statement does not cover "everything possible" (TP 69). CE 8 was not negotiated with the Union (TP 121),

Dockree said that the Company uses investigators, "when there is a potential theft or fraud" an offense for which the Company has no tolerance (TP 69, 71). He said that lying is a form of fraud or deception. (TP 69, 71, 72).

Dockree said that CE 11 constitutes the Grievant's disciplinary file and contains descriptions of four Disciplinary Actions Memoranda and one Note to File all regarding

---

[2] The Employer in CE 4 is AIM and the Employer in CE 3 is Norampac a corporation rebranded as "Cascades" for the current cna, JE 1. (TP 52)

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

attendance. CE 11 covers the period December 28, 2007 to February 12, 2019. (TP 72-73).

Dockree said that employees are required to call in absence to an outside service one hour before the shift.  An e mail of the call is made and sent to the Company with a time stamp (CE 12, TP 102-103). CE 12, a record of the Grievant' s calls, show that he always called in very close to one hour before his shift was to begin (TP 103).

UE 2 is the Company's attendance program. The program does not assess points for FMLA absences (TP 121). Unexcused absences accrue three points for the first day of absence and one point for each day thereafter (TP 123). Points can be deducted for good attendance.  Based on CE 11, Dockree said that Nemorowicz had "seven spots where he got points in 2015 and two where he got credits" later amended by Dockree  to "four instances in 2015" and three in 2016 (TP 124) He testified that Nemerowicz's accumulation of attendance points places him "in the middle of the pack" compared with other employees (TP 128).

Dockree said that in 2018 he began keeping a record of employee absences using the call-in system. He said that he compiled a graphic showing the Grievant's absences for FMLA, sickness, statutory holidays and call out days covering the period from 2016 forward. He said that it revealed a pattern of absence around weekends, holidays and vacations (TP 73-80).

Dockree said that in 2018 Nemorowicz was on an FMLA absence for migraines  three days prior to Thanksgiving break, in December he took Monday and Tuesday off for migranes, he took the Martin Luther King day (Monday) off in 2019, and he took a Friday off and the Monday of President's Day weekend off in February . In April and June he took Mondays off, the latter just before his vacation.

By August 2019 Dockree said that Nemorowicz was scheduled for vacation but had used his vacation allotment up. He called in for sickness on August 2nd, a Friday, and the following Monday and Tuesday.   He testified that he is unaware of any other employees who have been absent from work on Mondays and Fridays as frequently as Grievant Nemorowicz (TP 131)

Dockree said that Nemorowicz used "attendance points … Until he gets to a discipline point, and then starts using FMLA." CE 12 shows that Nemorowicz's absences in August 2019 were charged to FMLA leave because of migraines. (TP 127)

Dockree said that the Company retained an investigative firm to surveil Nemorowicz during the August absences and they made video and photographic recordings (CE 13, 14).[3]  The Company has not used an investigator for any other employee (TP 127)

---

[3] The Union objected to the use of the visual representations based on several legal arguments. A ruling was made which permitted the showing of the visuals with the understanding that a later determination would be made by the Arbitrator upon a further review of the parties' arguments in their briefs as to their admissibility (TP 105-106).

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

Dockree said that based on a review of the visuals, the Company concluded that Nemerowicz was capable of working on the days he called in for FMLA absence in August. (TP 108). The decision to terminate his employment was made by Dockree, HR Manager Michelle Rosowicz and Regional General Manager Craig Griffith (TP 109).

Dockree said that the absence of employees causes their work to be covered by overtime or forced overtime. When the work cannot be covered, the Company may be forced to shut down machines at a cost estimated to be $12,000 per hour of lost production. Because of these costs Dockree said that any absence caused by fraud "is very serious" (TP 110).

Dockree testified that in making the decision to terminate Nemerowicz Company officials considered his pattern of absences, prior discipline and length of service. He said that Nemerowicz's designation as a Union steward was not a consideration in the decision to terminate his employment.

Dockree said that previously, the Company approved Nemerowicz's medical leave and had been apprised that he suffered migraine headaches. (TP 119)

Production Manager Christopher Debinski testified by telephone with the agreement of the parties and the Arbitrator. He said that he supervised Grievant Nemerowicz and interviewed him with regard to his use of FMLA leave.

Debinski testified that HR Manager Michelle Rosowicz was present for the interview. He said that Nemerowicz, a Union representative, did not request representation during the interview nor was it offered to him. (TP 82-83, 90-91) Nemerowicz was not told that the interview was of an investigatory nature (TP 94).

During the interview Nemerowicz was questioned about his migraine headaches and said that the medication he takes for the headaches, "screws him up" that he, "can't do anything," it's as though he is in a, "seizure mode". He said the medications incapacitate him for several hours, "like your stoned after you take the meds until it all wears off," that he doesn't do anything after taking the meds and, "lay in bed when I take them and that's it". Debinski testified that Nemerowicz said that he can tell when the migraines are coming and will take a pill in anticipation of their arrival (TP 84-85).

Debinski said that the Grievant could not recall the specifics of his absence on Friday, August 2nd or the following Monday August 5th. He described Nemerowicz as "evasive" in the answers he gave during the interview (TP 86, Union Exhibit [UE] 1, Debinski's notes of the interview, TP 97).

Debinski testified that he has no formal medical or pharmaceutical training and is not familiar with the drug sumatriptan succinate. He said that he does not know of the drug's use to treat migraine headaches, including its side effects and the time required for them

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

to wear off. He is familiar however, with the effects of the drug on a person's ability to operate machinery (TP 88).

Debinski stated that during his interview of Nemerowicz, he did not conduct any medical tests and did not personally observe him on either August 2nd or 5th. (TP 88-89).

Debinski said that the decision to terminate Nemerowicz was made by himself, Dockree and Rosowicz.

President and COO of Peter Vito Associates, Patricia Hensley, said that the firm is licensed, conducts private investigations and was retained by the Company for whom it prepared a report (TP 132-133, CE 13).

Hensley said that CE 13 contains information from investigator's notes. None of the investigators have medical training. Their information was gathered via observation, photographs and video .She said the names of two investigators in CE 13 were erroneously transposed. (TP 135-136).

Lisa Vito, an investigator and vice president of Peter M. Vito Associates, said that on Friday, August 2, 2019, at approximately 3 pm she surveilled Grievant Nemerowicz. She testified that she had been told the Grievant had called into work because of migraine headaches (TP 144)

Vito said that she saw Nemerowicz climb out of a swimming pool using a ladder, sit in a lawn chair, drink a beverage and look around. He was wearing swimming trunks (TP 138-139, 143). She testified that she took photographs, including CE 14, which was taken around 3:30PM on August 2, 2019 (TP 141). Vito said that she was given permission to walk around the property on which she observed and photographed Nemerowicz (TP 147).

Vito said that on August 6, 2019, she observed Nemerowicz leave his residence driving a vehicle and, at a later time, return to the house. She said that CE 13 accurately states what she observed (TP 140, 146, 148).

Vito said that she does not have medical training and is unfamiliar with sumatriptan succinate (TP 141-142). She did not conduct any medical tests on Nemerowicz.

Investigative supervisor Richard Urbanski testified that on August 6th, between 4 and 5 pm, he observed Nemerowicz inside a Chevy SUV which was backed up in front of a garage door. He testified that the description of his investigation contained in CE 13 is accurate (TP 154).

Urbanski said that he has not received medical training, is unfamiliar with sumatriptan succinate and cannot identify symptoms of the drug's use. (TP 152).

## Federal Mediation and Conciliation Service (FMCS)
### 190815 - 10067

Investigator Richard Rooney said that on August 2nd and 5th he participated in the investigation of the Grievant. He said that on August 2nd, he and Investigator Vito were at a campground near Holland New York where he observed Nemerowicz sitting beside a swimming pool.

Rooney said that on August 5th he went to the Grievant's house in Cheektowaga where he observed a purple minivan that was wet as though it was being washed. He said that the Grievant emerged from a house with a broom and a hose. He displayed no physical disability as he washed the car and as he accompanied a woman who appeared to be reading a utility meter at the house. He made a video tape of his observations[4] Taken from a public street (CE 14, TP 155-158, 162, 164). He testified he saw Nemerowicz drive the car he had been washing (TP 162)

Rooney testified that CE 13 accurately describes his activity but it incorrectly transposes Urbanski's name with his own name. (TP 159-160).

Rooney said that he has received no medical training, is unfamiliar with the drug sumatriptan succinate and does not know what its symptoms are when used. (TP 161). He performed no medical tests on Nemerowicz (TP 162)

Called as a rebuttal witness, Dockree stated that the Company's attendance policy is based on the innocent use of call outs for leave. FMLA leave however, is mandated by statute and imposes legal obligations. Where the terms of use of FMLA leave are violated by the leave being taken for unauthorized purposes, fraud exists he said.   Dockree stated that Nemerowicz's absence pattern showed that he had taken 14 or 15 Mondays or Fridays as leave days (TP 248).

**Union's evidence:**

President of Local 503, Michael Stafford, testified that his duties included the negotiation of collective bargaining agreements such as JE 1, the administration of grievances to enforce those agreements and participation in labor management meetings.  (TP 165-166)

Stafford said that he has known Grievant Nemerowicz, one of three shop steward, since 2012. Because Nemerowicz is the second shift shop steward, Stafford said that he communicates with him more often than with the other stewards. As a steward, Stafford said that Nemerowicz identified issues that might be viewed as contrary by the Company.

Nemerowicz has handled grievances and offered testimony in opposition to the Company position (TP 169). Nemerowicz participated in an arbitration, UE 3, in which the Union prevailed over the Company (TP 172-173).

---

[4] The tape drew the same objections as described in page 5 (supra) and resulted in the same ruling.

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

Stafford said that he has never received complaints from other employees about the Grievant and the Company has never complained to him about "the quality of Joe's work". (TP 170).

Stafford said that he first learned that Nemerowicz had been suspended from work the afternoon of August 7th. No Union representative was present to represent the Grievant at the meeting prior to his suspension. Stafford said that he filed a grievance, JE 3, regarding Nemerowicz's termination, claiming a violation of Article 6. On August 9th an ULP charge was filed with the NLRB against the Company (UE 5, TP 181-186)

On the Monday following the Grievant's discharge (8/12), Stafford testified that at a labor management meeting HR Manager Rosowicz told him that the Company "had enough evidence [to discharge Nemerowicz]" and she would send it to the NLRB representative "to see if they (the Company) were being unjust" (TP 189-190, UE 6).

Stafford said that he is unaware of any other time the Company used a, "private investigator to scrutinize employees" (TP 193). He said that he was aware of a letter from Joseph Giroux, a Union attorney, stating that the cna did not contain a "discharge for cause provision" (TP 194-195). He acknowledged that except for the vacation provision in the cna, "cause" does not appear anywhere else (TP 196 and see 198).

Stafford said that provisions in the cna such as seniority, would be rendered meaningless if the Company could fire employees at will. He testified that the Weingarten [5]rule would be violated if an employer failed to inform an employee they were being investigated. The Company did not so inform the Grievant when he was questioned prior to being suspended (TP 199-200). Stafford stated that Nemerowicz, a second shift shop steward, believed the meeting prior to his discharge was for the purpose of discussing another employee, not himself (TP 202).

Stafford said that the Company did not supply him with the evidence it said it relied upon to discharge Grievant Nemerowicz (TP 201).

Grievant Nemerowicz's seniority is 2004, his present title is baler and his base pay rate is $17.08. The baler which Nemerowicz operates is considered to be industrial machinery. He also works on a shredder and an ink splitter. He testified that these machines can cause injury if not operated properly (TP 203-205, 238).

Nemerowicz said that he has received one performance evaluation during his employment and it rated him with the "highest possible marks" (UE 8). He said that he has never received criticism for his work from his supervisors. (TP 207, 209).

The Grievant said that the memos in CE 11 contain attendance write-ups for the point system. The write-ups are generated as points for poor attendance and accumulate. Points

---

[5] NLRB vs Weingarten Inc. 420 US 251, 88LRM 2689

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

may be deducted as well for favorable attendance. Points do not accumulate for FMLA leave.

Referring to CE 12 - e mails memorializing the Grievant's call-ins for absences- he testified that he called in a personal leave absence on June 8th but did not have a headache that day (TP 211).

Nemerowicz said that he has been a Union steward for 8 years (TP 238) He testified that as a steward he represents the interests of employees with the Company, helps negotiates contracts with the Company and has supplied an affidavit in favor of the Union ( TP 211-212, See stipulation No. 3 supra).  He said that the Company has never disciplined him for Union activity (TP 239)

Nemerowicz said that he gets migraine headaches which make it impossible for him to operate machinery. He takes medication for the headaches and it may cause nausea and vomiting. The headaches, for which he first started treating with a neurologist in the Buffalo Medical Group four years ago, have become more severe recently causing him to miss work eight or nine days since 2018 (TP 213) . He said that the effects of the medication may last eight to ten hours or for as long as two days. Normally he said the effects last for 24 hours (TP 239, 242)

Nemerowicz testified that he takes sumatriptan succinate for migraine headaches (UE 9 TP 214). He said the effects of the drug are that he feels lightheaded, has nausea and gets the shakes, sweats and chills. The drug usually takes four to five hours to wear off and renders him incapable of operating machinery. He said that he may take a second dose of the medicine 16 hours after the first does if needed (TP 240). He stated that he has not informed the state DMV that medication he takes prohibits him from driving a vehicle (TP 242) and he drives himself to work (TP 245)

Nemerowicz said that the Company was made aware of his medical condition and filed FMLA paperwork with his physician (UE 10, TP 216-219). UE 10 states that Nemerowicz is unable to perform the functions of his job based on information supplied to his physician by the Company regarding the functions of his job (TP 218-224). He stated that the Company accommodated his FMLA leave requests in January, February and April because of migraines and the medication when it approved leave for which no points were charged. (TP 224-225)

On August 2nd Nemerowicz said that he was at his campsite when he woke up with a migraine headache for which he took one does of his medication. During the day he rode around in a golf cart, was in a swimming pool which he emerged from on a sloping surface, not a ladder. He said that by dinner time he was still feeling "funny."

Nemerowicz said that he did not give permission to be photographed and stated that the campsite office is not staffed on Friday. (TP 226-227). Nemerowicz stated that when the photograph of him was taken - CE 14 which depicts him sitting in a chair by a swimming pool – he was , "relaxing, basically recuperating" (TP 243).

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

Nemerowicz said that on August 5th and 6th he did not operate a motor vehicle but was a passenger in a car driven by his fiancé, Tina. He also said that CE 13 was incorrect in that the Lincoln described there belongs to his neighbor, Michael Wagner. Also, his house does not have a storm door and he did not enter the swimming pool wearing glasses (TP 229-230).

Nemerowicz said that on August 5th and 6th he took medication in the morning when he was not feeling well and stayed in his home both days. He said it was not safe for him to operate equipment because of the equipment.  (TP 231-232, 234)

On August 7th Nemerowicz said that he was summoned to a meeting where he was questioned about how he was feeling and asked about his medication and how long its symptoms lasted. He was not offered a chance to request representation. The meeting ended in about 5 minutes at the conclusion of which he was told by Rosowicz that he was being suspended. The next morning he was told he was being terminated and that was confirmed in a letter stating that he committed FMLA fraud (JE 2, TP 233, 246).

Grievant Nemerowicz said that he recognizes a difference between FMLA fraud and attendance violations (TP 244).

## POSITIONS OF THE PARTIES:

### Employer (Cascades):

Overview:

The Company's right to discharge the Grievant is not subject to scrutiny for cause. The cna contains no cause provision, a fact well known by the Union especially since being so advised by a former counsel and a status tacitly acknowledged by the fact that the Union has never arbitrated the discharge of an employee. Inasmuch as the cna specifically bars amendment or addition of language to the cna and since no express provision of the cna has been cited that would disturb the Company's right to discharge Nemerowicz, the discharge must stand.

The parties, exercising their prerogative to negotiate contracts and draft language acceptable to both, [6] chose not to provide in the cna cause or just cause as the standard by which discipline is to be measured. And, even though contrary to many collectively negotiated labor/ management contracts, they chose not to provide for cause or just cause as the standard by which discipline is to be measured. What is included in the language is the unequivocal right of the Company to discharge which, when taken together with the absence of any language mandating the standard to be used to review discharge, means that the common law principle of employment at will prevails here (Citations Omitted [CO].

---

[6] Citing Volt ….

If the circumstances surrounding the Grievant's discharge are reached however, the Company's decision to discharge was shown to be with merit. Nemerowicz abused the leave provisions available to employees, including FMLA leave, as shown by the pattern of absences he took virtually all of which extended a weekend or holiday.  Union objections notwithstanding, valid documentary proof related to the three days in August, during which the Grievant claimed he was legitimately absent, show him engaging in activities which are contrary to the sickness he claimed to be suffering from.

Argument:

Because of the Union's insistence that the clear and unambiguous language of the cna to the contrary, this is a discharge subject to the just cause standard, the case becomes   a matter of contract interpretation, not discipline. As such, the burden of proof rests upon the Union and it has failed to meet that burden (CO).

By operation of Article 5.04, Step 5 of the Grievance Procedure, any possibility that cause may be implied in the cna, which contains no such explicit provision, is extinguished. (CO).

An at will employee may be discharged without explanation unless said discharge violates a specific statutory or constitutional provision or is restrained by language in a contract (CO). Here, no such restrictions exist. Indeed, none of the three cnas which preceded JE 1, and JE 1 itself, contain a cause provision and nothing was offered showing any effort by the Union to ever attempt to negotiate such a provision into a cna.

The grievance is not arbitral since it fails to meet the prerequisite language of Article 5.02 which describes a grievance as an assertion that an, "express provision" of the cna has been violated. This threshold language is unaffected by the language in Article 6.02 which is procedural only and "does not apply to arbitration" since the grievance itself fails to meet the descriptive requirements of Article 5.02 (Company Brief [CB] p. 21). Section 6.02 means no more than that a contested disciplinary action is meant to …" give(s) the Company a final review of its actions short of arbitration and provides employees with some due process review." (CB p. 22)

The Union asks that the express language of the cna be disregarded and that an implication be found in favor of a just cause standard. At law the matter should be dismissed for failing to state a cause of action.  In arbitration the well settled practice[7] is to require that   an award must be shown to have, "drawn its essence from the collective bargaining agreement" (CB p 23).

Section 5, step 5 of the cna limits an arbitrator's authority to, "deciding only whether a specific provision of this Agreement has been violated." As such, the Arbitrator is

---

[7] Reference The Steelworker's Trilogy

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

prohibited from considering the Grievant's NLRB claim under <u>Dubo</u>[8] because there has been no mutual party consenting to such an extension of the Arbitrator's authority. (See Rebuttal Arguments, CB p.35). The NLRB <u>Dubo</u> deferral came after the parties had rested their cases in chief. And, in any event the Company objected as irrelevant the Union's efforts to show retaliation against the Grievant.

Although Article 15.01 is a non-discrimination clause, the several statuses delineated there do not include union activity. The Arbitrator would confront and exceed the limitations on his authority, as specified at Article 5, Step 5, if he were to construe "union activity" in his evaluation of the record of the case. And, for that matter Nemerowicz' own testimony substantiates the Company's claim of no discrimination.

The NLRB cannot, via deferral, amend the plain language of the parties' cna which specifically limits the Arbitrator's authority "… to determining whether there was a violation of a specific provision of the CBA itself"" (UB p. 35) The record provides ample evidence to sustain the termination of Nemerowicz thereby defeating any argument that the evidence was pretext for his discharge for protected activity.  Nor can the Grievant use his status as a Union official to engage in dischargeable conduct, in this case, fraud (CO).

The record shows a pattern of absences by the Grievant occurring in conjunction with weekends and holidays that statistically cannot be excused as times when Nemerowicz was legitimately ill from migraine headaches.[9] The evidence of witnesses from the Vito firm further establish behavior by Nemerowicz that is inconsistent with illness from migraine headaches and with Nemerowicz' own description of his symptoms (CB p 32-33). Arbitral authority in a companion case exists to show that a careful dissection of evidence and the application of reason can be useful aids in exposing testimony as false (CB p 30)

Accordingly, absences claimed by Nemerowicz were fraudulent, constitute theft and are a proper basis for termination for a first offense. (CO).  Those absences created unjustified cost to the Company,  not only for the expense of overtime pay to cover Nemerowicz' s work but because of the very significant cost that would occasion upon the machine he operated being shut down.

The Company's decision to terminate Nemerowicz was arrived at only after a careful accumulation of evidence that supported a finding of his fraudulent conduct. That conduct confronted the statutory purpose of the FMLA which described the abuse of leave under the statute as, "under cuts the very purpose and intent of the statute" (CB p 27).

Grievant Nemerowicz received due process. An investigation was conducted by the Company and a consensus reached as to his termination. Had he requested Union

---

[8] <u>Dubo Manufacturing Corp (Dubo) 142, NLRB 431 (1963).</u>
[9] "…absences occurred on a Monday or Friday, far more than would be likely based on random probability" (CB p 28 and see p. 29-30)

representation when questioned, it would have been provided Nemerowicz thereby
protecting his <u>Weingarten</u> rights. As an experienced Union representative however, the
Grievant can surely be assumed to know what rights he had and therefore he may be
presumed to have knowledgeably waived the right to representation (CO).

When questioned, Nemerowicz did not respond candidly but was described as "evasive"
by Debinski. His inability to accurately recall events renders his challenge to the
observations of the Vito investigators a fabrication. Nemerowicz' self interest in
portraying incidents in a manner favorable to himself has been widely acknowledged by
arbitrators as a strategy which should discount the veracity of their testimony (CO).

**Therefore, based upon the record of the case and the arguments set forth above**
**which construe that record, the "Company respectfully requests that the Arbitrator**
**deny and dismiss the grievance in its entirety." (CB p 40).**

**Union: (L. 503, Graphic Communications Conference of the IBT)**

Overview:

The record shows that Grievant Nemerowicz, a Union steward for more than six years,
began suffering from migraine headaches in 2015. Because of his medical condition
Nemerowicz was prescribed a medication to alleviate the effects of the migraine
headaches. The medication renders the Grievant incapable of operating machinery.

The Company was provided with FMLA forms with information supplied by the
Grievant's physicians which established his need for intermittent leave. Those forms have
been accepted by the Company to excuse Nemerowicz from work while taking the
medication.

The Grievant was absent from work on August 2, 5 and 6 because of the influence of the
medication he was taking for migraine headaches. Because of these absences and without
a proper investigation, the Company terminated the Grievant's employment.

This history establishes that the Company's excuse for discharging the Grievant, as
shown by its "sloppy investigation", was pretextual, that the real reason for his discharge
was "retaliation for his Union leadership" (Union Brief [UB] p. 1)

Argument:

In his job as a Union steward, Grievant Nemerowicz has occupied roles in opposition to
the Company whose relationship with the Union has been strained. He has been present
during collective bargaining and labor- management meetings with the Company, has
appeared as a Union witness in an arbitration hearing and in an NLRB trial and in an
injunction proceeding in the US District Court for Western New York. The Union
prevailed in the NLRB proceeding and the arbitration proceeding.

**Federal Mediation and Conciliation Service (FMCS)**
**190815 - 10067**

The Company accepted the FMLA form and excused Nemerowicz from work in January, twice in February and in April and June all because of the side effects of the medication he took for the migraine headaches. His absence from work on August 2nd followed the same protocol as the earlier absences arising from the medication meaning that he was rendered incapable of safely operating the equipment which his job required him to operate. It was during his recuperation from the drug that he was surveilled and photographed by employees of the Vito firm. However, inconsistencies in the testimony of associates of the Vito firm, errors in their report and their amateurish efforts at creating video and photographic evidence render evidence attributed to them and offered by the Company as wholly without value.

Nemerowicz had a reasonable expectation that at all times when he was being surveilled in August by associates of the Vito firm, that his presence on private property should have shielded him from improperly obtained evidence. The fact that it did not should be a basis for that evidence to be disregarded (CO).

Nemerowicz' absence from work in August was because of a medical condition yet the Company failed to either inquire medically into his condition or in any way to establish that he was medically fit to report to work. Had such an inquiry been made, information gathered by the Vito associates would have been shown to be consistent with the Grievant's efforts to recuperate from the use of a drug to treat his migraine headaches.

There followed on August 7th a pre-suspension, disciplinary meeting with Nemerowicz, yet, contrary to Article 6.03 he was denied the option to be represented at that meeting nor did the Company ask for medical evidence of his condition.

Nor has the Company disclosed to the Union, prior to the arbitration hearing, all of the evidence offered at that hearing thereby compromising the purpose of the grievance machinery as well as a directive from the Arbitrator. Specifically withheld was information the Company relied upon to make its claim that a pattern of absences by the Grievant is evidence of FMLA abuse (See TP 79).

Analysis:

Contemporary labor relations imply a basic right of due process with regard to the implementation of cbas. That implication carries to the standards for reviewing employee discipline and discharge where, even if not described in the labor/management contract, just cause is the proper standard to apply. (CO). Were this not the case here then the Company could discharge for any reason or none at all.  They would then be empowered to fire employees seeking to obtain benefits described in the cna thereby rendering the entire contract a nullity.

Article 6 enshrines the right of employees, subject to discipline, to challenge that discipline including the right to challenge it through arbitration. The language does not state that challenges to discharge must acknowledge the Company's right to discharge "at will".  And, because of the specificity of the language of Article 6, it trumps and

supersedes options claimed by the Company at Article 2 (Management Rights). With regard to the just cause language that appears at Article $9^{10}$ , while it applies to the status of vacation benefits for employees who are terminated, it reasonably follows that the specific just cause predicate for discharged employees there impliedly must attach to all terminated employees.

The Company has failed to show that Nemerowicz was in fact fit and capable of working on the three days in August when they claim he was fraudulently absent. They offered no medical evidence at all yet to the contrary they were on notice that the Grievant had an ongoing medical condition the treatment for which rendered him incapable of operating industrial machinery. They rely on evidence adduced by the Vito associates but they failed to show that the conduct depicted by them was inconsistent with efforts of the Grievant to recover from the effects of the medication. (CO)

Given the nexus between Nemerowicz' work on behalf of and in support of Union activities and his discharge by the Company that he opposed in his Union role, a decision sustaining his discharge would have a chilling effect on the exercise of statutorily protected rights of employees in the future.

**For the reasons enumerated above, the Union seeks an award finding the Grievant's termination to be improper and it seeks an order for his reinstatement with full back pay with interest at 9% per annum.**

**DISCUSSION:**

Issue and burden of proof:

At the outset, a further description of the issue to be decided is required. Upon a careful review of the entire record and the extensive briefs of the parties, both with lengthy annotations, the issue remains:

**Was the discharge of Grievant Nemerowicz pursuant with the cna, including Article 6, proper? If not proper, what shall the remedy be?**

The Company's claim that this is actually a contract interpretation grievance, not a disciplinary matter which should, as such, shift the burden of proof to the Union, is without merit. There is no question whatsoever regarding the position the Company has taken here as a result of their decision to discharge Nemerowicz and that regards inter alia, the rights and privileges it has regarding the discharge of employees including Nemerowicz. However, the grievance as filed challenges the discharge per se, under the terms of the cna and it cites a specific provision. The Company's interpretation of the application of the citation occupies a considerable portion of this arbitration but it is abundantly clear that the discharge is the reason why the grievance was filed and why this arbitration proceeding is occurring.

---

[10] 9.05 "Employees discharged for just cause or who voluntarily …"

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

Admissibility of photographic evidence:

The Arbitrator reserved decision regarding the admissibility of photographic and video evidence offered by the Company. The Union contends that such evidence is prohibited by the NLRB Section 8(a) (1) as an impermissible invasion of a protected, concerted activity and by the Video Voyeurism Prevention Act (VVPA) regarding the creation of an image of a person in a private area without permission and by NY State Law (NY Civil Rights L Section 50) which prohibits images being taken without authorization from the subject. In sum, the Union asks that the evidence be disregarded as having been created in violation of Nemerowicz's expectation of privacy.

The Company disputes the application of the VVPA on the ground that the still image does not depict what the statute intends as "private area" meaning personal, private area.

The still image of Nemerowicz does not meet the description in the VVPA of "private area". The photo was taken of the Grievant in swimming trunks at a swimming pool at a public campground. Moreover, the record does not establish that Lisa Vito, who took the photo, was trespassing upon the grounds of the property at the time the photo was taken. Similarly, the testimony regarding the taking of the video images is that they were taken by Rooney from a public street (TP 162).

The argument that the videos and photographs impinge on Nemerowicz's Section 8(a) (1) rights is not distinct from the general argument the Union advances that any and all evidence relied upon by the Company to uphold firing the Grievant violated his Section 8(a) (1) rights. As such, that matter will be taken up within the context of the deferral commentary.

Lastly, the reference to the NY State Civil Rights Law regarding the use of unauthorized images appears to relate to their prohibited use when it constitutes "an invasion of the common law right of privacy"[11] and where the intrusion was deemed invasive because it took place where the subject's expectation of privacy could be reasonably presumed. That condition was not present here, either at the campground swimming pool or in a drive way, on a public street or outside of a house.

I admit the video and photographic evidence (subject to the caveat about the issue of deferral) but I note that the video evidence was so lacking in clarity and focus as to be virtually useless.

The doctrine of "employment at will":

The Company extensively cites the absence from Article 6 of just cause language which it readily acknowledges appears in virtually all other cnas.  It cites the failure of the Union to grieve other discharges occurring within the last several years, a communication

---

[11] Citing Nader vs General Motors (CO)

from a labor attorney citing the absence of just cause language in the cna and the failure of the Union to even propose adding such language as all placing the Union and others on notice that the traditional protection of just cause is absent from this cna and has been absent from all earlier cnas.

For its part the Union urges the application of the just cause standard stating that it should be implied as present as a pre requisite to achieving basic due process protection. Without such a standard the Company would be free to fire any employee without giving any reason even where the discharge was because the employee sought benefits such as compensation and fringe benefits prescribed for them by the cna. The Union cites the just cause reference in Article 9.05 to show that cause per se, does in fact appear in the cna and its presence there as a standard for allocating vacation benefits should also inform the application of Article 6 to all disciplinary matters.

The Arbitrator is unwilling to strictly apply just cause out of "whole cloth" to Nemerowicz's discharge if the discharge is to be construed strictly within the confines of Article 6. The absence of cause language there is so notorious that to impose it there without substantial reasons resting on other contractual considerations beyond Article 6 would be error. Nevertheless, there remains the essential question as to what standard, if any, is to be utilized for evaluating the Nemerowicz discharge and that is a question that must be answered since the specific language of Article 6.02 affords employees the right to "contest[ing] a disciplinary action" as happened here.

An appropriate resource to use in answering the question as to what standard should be employed in implementing the provisions of Article 6, is the cna itself. And indeed, such an inquiry will assure that the outcome in this proceeding draws its essence from the can.

The Preamble to the cna states the intention and purpose of the parties to be, "the promotion of harmonious relations between the Employer, the employees and the Union, the establishment of an equitable and peaceful procedure for the resolution of disputes …" Appearing at the very outset of the cna, this is more than precatory language and should be utilized as a guide toward the interpretation and application of the provisions of the cna which follow.

Article 2, the Management Rights provision, gives the Company the right to "terminate, discharge, discipline …employees," doing so however as long as "these rights shall not be contrary to specific provisions of this Agreement". However, the cna contains no "specific provision" giving the Company the right to discharge at will, even though that is the position being advanced by it in this forum.

There is also the anomaly at Article 9.05 of a clear just cause standard that applies to all discharged employees who have accrued vacation benefits at the time of their discharge. Those benefits accrue after one year of service and although they cannot accumulate leave from year to year they can carry leave forward within the year the benefit accrued. Therefore, for this class of employees the just cause standard does apply as a, "specific provision of this Agreement," meaning that employees within this class who are

discharged have a contractual claim to a just cause proceeding as a pre requisite to the disposition of their vacation accruals. Moreover, the just cause proceeding is mandatory upon the Company since provision for it appears as a "specific provision" in the cna thereby superseding the Article 2 Management rights clause.

Article 12 (Seniority) requires that employees serve a probationary period during their first 520 hours of employment. During that time they may not accrue seniority nor "receive benefits specifically provided for in this Agreement and they may be dismissed or otherwise terminated by the Employer" without recourse to the "grievance and arbitration provisions of this Agreement". Following the probationary period Article 12 provides for seniority to commence and for benefits to become available to employees. If however, the Company's application of the at will doctrine applies to Article 6 the only benefit gained by an employee who successfully completes their probationary period, with regard to discipline, is the right to have a Union representative present at the Article 6.03 meeting and the right to contest the discharge ---though without the Company being obligated to justify the discharge. Therefore, assuming the at will doctrine to be operative, the benefit obtained by a non- probationary versus a probationary employee with regard to termination, is very modest - the right to have someone present at the discharge hearing.

Section 8(a)(3) of the NLRA provides that it is:

> "an unfair labor practice for an employer...by discrimination in regard to hire, tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization..."

Pursuant with Babcock & Wilcox Construction Co. 361 NLRB No 132 (2014) and the filing of an ULP charge regarding Nemerowicz' discharge, the matter was deferred by Regional Director Murphy to arbitration where it presently resides here despite the Company not consenting to the deferral.

The parties stipulated that the Grievant was a Union witness in a proceeding before the NLRB which the Company lost and he signed an affidavit favorable to the Union in a civil action against the Company which the Company also lost. And he appeared as a witness in a labor arbitration which the Company lost. Nemerowicz has also served as the second shift steward for 8 years, is present at labor management meetings and has participated in contract negotiations.

The Union claims that the Company's excuses for discharging Nemerowicz are mere pretext, that his discharge was motivated by the Company's desire to remove an employee who was actively pursuing rights protected by the NLRA and that pursuit had an adverse impact on the employer. The Company vigorously denies this allegation and states that it had good and sufficient reasons to discharge Nemerowicz.

To evaluate these competing positions it is necessary to adopt a standard by which the Grievant's discharge can be measured since if it is found that the discharge was without

merit that would sharpen the focus as to what the reasons for the discharge actually were. Such a standard is just cause, a measure which both parties agree appears in many union/management contracts, perhaps a majority. In addition, the review of "specific provisions" in JE 1 set forth above discloses the need for a standard to reconcile these provisions and reconciliation is needed to meet the purpose described in the preamble, i.e., "harmonious relations" and an "equitable and peaceful procedure for the resolution of disputes". In addition, the absence from Article 6 of a written standard by which a "disciplinary action" can be grieved does not automatically give rise to the imposition of the unrecorded at will doctrine advanced by the Company. This is especially so since a purpose of this inquiry is to evaluate the merits of the ULP claim and the use of a widely recognizes standard for measuring the Company's decision to fire will help frame that inquiry.

Inasmuch as the Company conceded that, "An at will employee may be discharged without explanation unless said discharge violates a specific statutory or constitutional provision or is restrained by language in a contract "(CO supra p. 12), an inquiry into federal law giving employees the right to engage in protected activity is appropriate and such an inquiry has been recognized in numerous cases (CO).

It follows therefore, that if Nemerowicz' discharge meets the just cause standard, it may then be inferred that he was not discharged because he engaged in protected activity.

The application of just cause to Nemerowicz' discharge:

To be sustained, the just cause standard requires that the discipline be the result of the violation of a reasonable work place rule for which notice was provided, that a fair and complete investigation occur producing sufficient proof that a violation occurred, that the penalty be proportionate to the offense and one which properly accommodates to mitigating and/or aggravating circumstances and that the penalty be equal and/or proportionate with that administered to other similarly situated employees.

Nemerowicz is accused of both violating the Company's Code of Ethics and FMLA rules by being improperly absent from work as a result of claiming illness when he was not sick on a Friday. Monday and Tuesday in August. The Company's investigation consisted of a review of Nemerowicz' absences which showed an overwhelming number occurring on Mondays and Fridays or before or after a holiday. In addition, the Company offered proof of the Grievant's activities on the three days of absence which they claim was inconsistent with symptoms associated with the claimed illness – migraine headaches- or the effects of a drug taken to treat migraine headaches – sumatriptan succ. The symptoms they relied upon were those based on the Grievant's description.

I find the rule reasonable, however, a question does arise as to notice of the application of the rule by the Company for fraud and theft based on the use of leave caused by illness. This is particularly so here where the Grievant had supplied the Company with evidence of a chronic illness and been excused from work frequently based on that illness.

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

More specifically, the Company was on notice as of April 2019 that Nemerowicz was being treated for migraine headaches, that the condition could last a lifetime, that he was prescribed medication for the condition and it rendered him incapable of performing "all job functions" and that the condition caused "flare ups periodically". Moreover, the FMLA form in the Company's possession (UE 10) described the frequency of flare ups as 2 times a week once a month for a duration of 2 days each. The symptoms were described as "pain, sensitivity to light, sound, movement as well as nausea and vomiting."

The possible side effects of the drug taken to control the headaches are extensive (see UE 9) but include the description Nemerowicz' testified to, "lightheaded, nauseated, literally get sick before I get better … shakes …, chills, the sweats" (TP 216). As well as the description he gave to the Company, "I can't do anything. Literally puts me in a seizure mode –state almost. And he said that's how bad they get ….you feel like you're stoned after you take the meds until it all wears off" (TP 85).

The Company argues that the statistical odds that legitimate absences for sickness compiled by Nemerowicz only on the days before and after weekends or holidays and vacations was a near impossibility and is a cogent argument strongly implying abuse. Coupled with this were the observations of the Peter Vito associates on the three days at issue during which Nemerowicz is not seen displaying the symptoms he described or that were described in the FMLA form or on the medication label. Both the pattern of the leave, though not its frequency based in the FMLA description UE 10, and the Vito Associates' descriptions constitute circumstantial evidence that abuse may be occurring but they are not direct evidence.

The distinctions between legitimate absences taken to complete recovery from a debilitating drug taken to eradicate the effects of a disabling illness and an outright fraud or theft [meaning that Nemerowicz was healthy and able to work but simply chose not to] are finite. The consequence of this finite distinction however, is substantial, a balance between absence sanctioned by a collectively negotiated cna, and activities protected by federal law versus termination from employment. The determination between those stark alternatives rests upon a measure of the validity or invalidity of the absences and the answer to that inquiry rests on severable variables. Because these variables have not been satisfactorily answered in all respects, the Company had an obligation to either obtain more conclusive proof of actual fraud before implementing a discharge or to significantly mitigate the penalty to a written warning.

The Company's haste in deciding to terminate the Grievant is even more surprising in light of their failure to properly advise Nemerowicz that he was participating in a pre-termination Article 6.03 meeting and could request representation, that he was a career employee with over 15 years seniority and that, except for attendance issues that were unremarkable, the Grievant had a good work record.

In sum, the Company's investigation was incomplete in that it failed to produce a sufficient body of evidence required to sustain the ultimate penalty of discharge for a first

Federal Mediation and Conciliation Service (FMCS)
190815 - 10067

offense. The penalty was therefore seriously disproportionate to the proof elicited in support of the alleged offense.

In light of this conclusion, I find that the Company was motivated to remove Nemerowicz from employment in violation of his exercise of protected rights.

**AWARD:**

1. **The Company's discharge of Grievant Joseph Nemerowicz was improper pursuant with Article 6 and the cna.**
2. **The Grievant shall be administered a written warning regarding his use of FMLA leave or sick leave occurring pursuant with the cna.**
3. **The Company shall, within thirty days of the date of this Award and Opinion, return Grievant Nemerowicz to his position as baler and shall provide him with all pay and benefits withheld as a result of his termination.**
4. **The Grievance is sustained**
5. **This decision disposes of all matters presented in this grievance arbitration.**

**State of New York:**
**County of Saratoga:**

**I, Eric W. Lawson, am the Arbitrator named above and I certify that the within is my opinion and award.**

**November 28, 2019**

**Eric W. Lawson**